Filed 8/9/22  P. v. Law CA6

# NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SIXTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>AUDRY WAYNE LAW,<br><br>    Defendant and Appellant. | H047356<br>(Santa Clara County<br> Super. Ct. No. 217200) |

Appellant Audry Wayne Law killed Phong Huu "Peter" Nguyen by multiple blows to the head with a rock and possibly a brick. A jury acquitted Law of first degree murder but rejected his claim of self-defense, convicting him of second degree murder.

Law raises two primary claims of trial error: (1) the prosecutor engaged in misconduct by misstating the facts and the law during closing and rebuttal arguments; and (2) the prosecution failed to timely disclose evidence relevant to impeachment of the medical examiner. Because, on this record, we conclude that the undisclosed impeachment evidence was not material and there is no reasonable likelihood that the prosecutor's misstatements influenced the jury, we affirm.

# I. BACKGROUND

In a confidential indictment, the grand jury alleged that Law murdered Nguyen and personally used deadly and dangerous weapons, a rock and brick, in the commission of the offense.

## A. *Trial Evidence*

On July 12, 2016, Hoang Thi "Jenny" Ho was looking for Nguyen. Ho was concerned about Nguyen's health because, when Ho had seen him that morning, he had been doing crack for three days and seemed "very tired" and "weaker" than usual. She tried calling Nguyen but received no response. When Ho did not find him at his house, she drove by Law's house at around 4:00 or 5:00 p.m.: Law and Nguyen were friends, and Nguyen frequently visited Law, sometimes with Ho, sometimes to use crack together.

Nguyen's car was parked in Law's driveway. Because Nguyen had not been answering his phone, Ho called Law and offered to bring him some crack and to "hang out." When she returned with "the goods," Ho spoke to Law in person in the driveway. Ho noticed a "chunk" of blood—and "not, like, fresh color blood"—on Law's face. Ho asked about Nguyen, but Law told her that Nguyen had left. Ho left but, thinking that Nguyen might be inside avoiding her, returned a few minutes later, knocked on the front door, and asked Law to let her inside so they could smoke together. Law complied.

Law told Ho that Chau, another mutual acquaintance, was with him. By that time, Law had cleaned the blood off his face, and Chau was in the bathroom. Chau came out of the bathroom holding Nguyen's phone, which had been taken apart and was wet. Ho tried to fix the phone, but it would not work. At this point, close to 7:00 p.m., Ho was scared and left on the pretense that she was going to get some beer.

Early the next morning, Law called the police. At around 3:00 a.m., officers responded to Law's house. Law directed them to the side yard, behind a closed gate, where they found Nguyen's body between Law's house and a fence. There was "lots of

blood" near Nguyen's body in the side yard. Bloodstains continued past Nguyen's body in the direction of the gate, closer to the front of the house than where Nguyen's body lay. There were what appeared to be bloody finger marks on the inside of the side gate leading to the front yard. A bloody rock and a bloody brick were in a white trash can in the backyard. There was very little garbage in Law's house, leading the police to suspect that evidence had been removed. There were damp towels, shoes, and clothes in a washing machine in the laundry room, some of which appeared to have bloodstains. There was a bloody towel in the kitchen.

In a recorded conversation at the scene, Law told police that he and Nguyen had been drinking bourbon together before they decided to go outside and smoke cigarettes. Law said that he and Nguyen got into an argument and that Nguyen "went off," attacking him from behind while Law was at the side gate. Law hit Nguyen back, Nguyen hit Law with a brick or a rock, the two men struggled on the ground, and Law hit Nguyen with another rock. Law ran back into his house because he was afraid that he would end up "being locked up for something [when] I was just trying to protect myself." Law said his struggle with Nguyen occurred at about 7:00 p.m. on July 12. Law had ten injuries, most of which were scratches and abrasions on his body, knees, legs, arms, and fingers. In one officer's opinion, the injuries to Law's legs appeared "old," but an injury to Law's right middle finger was fresh. Law also had a slight bump on the back of his head.

In further interviews on July 13 and July 15, Law recounted that he had done "a line or so" of cocaine earlier the day of the killing. In the late morning, a woman named Tau or Chau brought a bottle of bourbon to Law's house, and they drank shots of bourbon together. Some time after the woman left, Nguyen came to visit. At around 7:00 p.m., they headed to the backyard, Nguyen following Law to the side gate. Perhaps because of something Law said, Nguyen struck Law in the back of the head. Nguyen struck Law a second time as Law turned to face him. At that point, Law either "just laid right into [Nguyen,]" or, at least, "took a swipe at" Nguyen. Nguyen may have thrown a

3

brick, one of many in the backyard, or a rock at Law from close range, either missing Law or hitting him in the leg. By this time, Law was "really, really, really pissed . . . off." The two men struggled on the ground, and when Law managed to get on top, he grabbed a nearby rock and struck Nguyen three times in the head and face. Law saw blood coming from the top of Nguyen's head, so he "took off and ran." Although Law did not believe Nguyen was dead at that point, Law feared seeking medical assistance would get him in trouble. Law stated that nobody came to his house at any point after his fight with Nguyen and before the police arrived.

Law was initially adamant that the gate was locked and that neither he nor Nguyen touched it. Told that there was blood on the gate, Law said that the blood probably came from his own hand, then said he was "more than 100 percent sure" that he touched the gate and opened it when he had blood on his hand, flowing from his cut finger. Law said that Nguyen never touched the gate and that there was "no way" the blood was Nguyen's.

While he was being interviewed, Law told investigators that he feared for his life while he was fighting Nguyen. Law allowed that he "maybe" or "in a sense kind of" feared for his life when he was hitting Nguyen with the rock: although Nguyen "was still fighting," Law "was on top" by that point.[1] In that vein, Law related a prior incident in which a Vietnamese man had threatened him with a gun at his house. A detective pulled the police report from the prior incident and determined that it had no connection to Law's fight with Nguyen.

Dr. Michelle Jorden, the chief medical examiner for Santa Clara County Medical Examiner-Coroner's Office, performed the autopsy of Nguyen. Testifying as an expert in the cause and manner of death, Jorden opined that the cause of Nguyen's death was "skull and brain injuries, due to multiple blunt head trauma." The presence of blood in his stomach and airway from his multiple facial fractures suggested that Nguyen

_____

[1] Nguyen was a 66-year-old man who, at the time of the autopsy, measured 5 feet 5 inches tall and 112 pounds. Law was 60, 5 feet 7 inches tall and 155 pounds.

4

remained "alive for a period of time" after the assault and "was choking on his own blood." But because his head injuries were "so massive and devastating," Jorden concluded that these alone would have been fatal. Jorden documented a total of 42 "injuries" on Nguyen's body, including seventeen "blunt force injuries" on Nguyen's head. Nguyen's injuries included skull fractures on the left side of his head, brain lacerations—"actual[] tearing of the brain tissue itself"—and facial fractures. He also had a displaced fracture in his left arm, two rib fractures (one on each side of his chest), and bruising on the back of his hands. Asked if each of the 42 "blunt force traumas" signified "separate blows," Jorden replied, "Not necessarily," and allowed that a "single impact can cause multiple injuries." Jorden was unable to say how many blows Nguyen received.

According to Kristin Dougherty, a forensic biologist with the Santa Clara County District Attorney's Office Crime Laboratory, Nguyen was the source of the DNA in a red-brown stained swab taken from the gate, in the samples from the bloodstained rock and the bloodstained brick, in the red-brown stain on the kitchen towel, and in several other apparent bloodstains in and around the side yard. Nguyen was a possible DNA contributor to a red-brown stain on a shoe recovered from the laundry machine. Law was a possible minor contributor of DNA on the rock and brick, and the stained kitchen towel.

Cordelia Willis, an expert in "bloodstain pattern analysis and crime scene reconstruction" with the Santa Clara County District Attorney Crime Laboratory, did not personally examine the crime scene or Nguyen's body but relied on the police reports, photos of the crime scene, photos of Law, Dougherty's DNA analysis, and Jorden's autopsy report.

Willis opined that the presence of vertical droplets of Nguyen's blood past the side gate indicated the presence of either Nguyen or an object dripping Nguyen's blood on the front-yard side of the gate. Further, Willis opined that during the altercation Nguyen was on or near the ground and blood was coming from his airways, possibly because he was

coughing it up, snorting it out, or because it was being knocked out of him. Willis believed that the fracture to Nguyen's left arm occurred as he tried to protect his already-bleeding face: there was a substantial amount of blood on his left sleeve that could only have originated from his head. Some of the bloodstains on the fence appeared "chunky," possibly due to the presence of brain matter that flew off as Law swung the rock or the brick. Willis opined that the brick and the rock had dried before being moved to the trash can, because there were transfer stains on the ground but none in the trash can. Willis stated that a series of bloodstains on the wall appeared to be handprints: these were consistent with either a hand or bloody object had been wiped on the wall, or with a person pressing a bloody hand against the wall for support.

At trial, the parties stipulated that: (1) A blood sample taken from Law at 3:15 a.m. on July 13 tested positive for cocaine; (2) A blood sample taken from Nguyen at 3:37 p.m. on July 13 tested positive for cocaine; and (3) one type of particle from Nguyen's brain was optically and chemically indistinguishable from particles found in a surface sample of the brick and another type of particle from Nguyen's brain was optically and chemically indistinguishable from a surface sample of the rock.

**D.**    *Closing Arguments and The Verdict*

Counsel made their closing arguments on April 30, 2019. The prosecution argued that there was sufficient evidence to find Law guilty of first degree murder beyond a reasonable doubt. The defense agreed that Law killed Nguyen but argued that Law acted in self-defense. In the alternative, the defense argued that Law could only be convicted of voluntary manslaughter because he had an imperfect claim of self-defense.

The jury reached a verdict on May 2, 2019. The jury found Law not guilty of first degree murder. However, the jury found Law guilty of second degree murder, a lesser-included offense. Moreover, the jury found that Law "personally used a deadly weapon rock and/or brick during the commission of" the offense.

6

**E.** *The Motion for a New Trial and Sentencing*

On May 24, 2019, the prosecution alerted defense counsel to the existence of an internal memorandum to District Attorney Jeff Rosen, dated nearly seven years earlier, with the subject line "Dr. Michelle Jorden" (Jorden Memo). The majority of the memo is redacted but bears headings reflecting content as to five separate deaths. The unredacted portion addresses an investigation into what the District Attorney's Office ultimately determined to be a sexual assault and homicide involving a toddler in 2012. According to the author, Jorden was "angry" that detectives had been reluctant to accept "without question" her initial opinion that the case was a homicide by asphyxiation and had delayed submitting the sexual assault kit to the lab for processing. Jorden reportedly "stressed [to the author] that she sees herself as an advocate for victims and could not understand why the investigators would allow a child molester to remain free." Although Jorden had initially been equivocal as to whether the child had been the victim of sexual assault, she modified her opinion upon the discovery of the suspect's DNA on the child's clothing to conclude that the cause of death was forced oral copulation.

On August 19, 2019, the day before the scheduled sentencing hearing, Law filed a motion for modification of the verdict and/or a new trial. As it relates to Jorden, Law argued that the memo reflected that Jorden was biased in her analysis, saw herself as a "victim's advocate" who "expects law enforcement to accept her opinions without question," was both "eager and willing" to influence the District Attorney and insufficiently independent of law enforcement, and "testified as an advocate for the decedent with the intention of securing a conviction." Law argued that the defense team, had it known of the memo pretrial, would have investigated Jorden's actions, requested a review of her findings by an independent medical examiner, and impeached her testimony.

The next day at sentencing, the trial court denied the motion. The trial court reasoned that whether or not the prosecution should have disclosed the memorandum to

7

the defense, the memorandum would not change the weight of the evidence with regard to the elements of the charge.

After ruling on the defense motion, the trial court sentenced Law to 15 years to life in prison. Law timely appealed.

## II. DISCUSSION

### A. *Misconduct in Closing and Rebuttal Arguments*

Law challenges the propriety of a number of the prosecutor's factual and legal assertions during his closing and rebuttal arguments. Law contends that the prosecutor misrepresented the facts adduced at trial in purporting to reconstruct the crime as it might have transpired. He contends that the prosecutor likewise mischaracterized the law as to the burden of proof and the legal significance of a defendant's attempt to clean up or suppress evidence. The record reflects no prejudicial error.[2]

#### 1. *Legal Principles*

As a general rule, a "prosecutor's conduct violates the federal Constitution only when it is ' " 'so egregious that it infects the trial with such unfairness as to make the conviction a denial of due process.' " ' [Citations.] A prosecutor's conduct that does not rise to the level of a constitutional violation will constitute misconduct under state law only if it involves ' " 'the use of deceptive or reprehensible methods to attempt to persuade either the court or the jury.' " ' [Citation.] A prosecutor is given wide latitude to vigorously argue [the state's] case and to make fair comment upon the evidence, including reasonable inferences or deductions that may be drawn from the evidence. [Citation.]" (*People v. Ledesma* (2006) 39 Cal.4th 641, 726; see also *People v.*

_____

[2] To the extent Law anticipates a determination that he failed to preserve by timely objection his claim of prosecutorial misconduct, he argues in the alternative, through a supplemental brief, that the failure to object amounted to a denial of his right to the effective assistance of counsel. Because we conclude that the prosecutor's tactics were not reasonably likely to have misled the jury, we need not address the parties' arguments as to forfeiture or ineffective assistance of counsel.

*Covarrubias* (2016) 1 Cal.5th 838, 894.)  But a prosecutor's right to present the facts favorable to the state's case in vigorous terms " 'does not excuse either deliberate or mistaken misstatements of fact.' "  (*People v. Hill* (1998) 17 Cal.4th 800, 823.)  Nor does a prosecutor's latitude in argument extend to misstatements of the law.  (*People v. Anzalone* (2006) 141 Cal.App.4th 380, 393.)

To establish that a prosecutor's statements to the jury constitute actionable misconduct, an appellant "must show that, '[i]n the context of the whole argument and the instructions' [citation], there was 'a reasonable likelihood the jury understood or applied the complained-of comments in an improper or erroneous manner.  [Citations.] In conducting this inquiry, we "do not lightly infer" that the jury drew the most damaging rather than the least damaging meaning from the prosecutor's statements.  [Citation.]' [Citations.]"  (*People v. Centeno* (2014) 60 Cal.4th 659, 667; *People v. Winbush* (2017) 2 Cal.5th 402, 480.)

Even where a prosecutor commits misconduct, reversal is not warranted absent prejudice.  Where prosecutorial misconduct violates due process, we evaluate prejudice under the standard of *Chapman v. California* (1967) 386 U.S. 18.  (*People v. Gionis* (1995) 9 Cal.4th 1196, 1214-1216.)  Where the prosecutorial misconduct violates only state law, we evaluate prejudice under the standard of *People v. Watson* (1956) 46 Cal.2d 818.  (*People v. Arias* (1996) 13 Cal.4th 92, 153, 161 (*Arias*) [no prejudice where it was "not reasonably probable that a result more favorable to the defendant would have been reached absent the misconduct or with a curative instruction"].)

### 2.    *Factual Misrepresentations*

The prosecutor in his argument purported to reconstruct from the traces left at the scene and on Nguyen's body the manner and circumstance of Law's killing of Nguyen, principally to bolster the allegation of premeditation and deliberation required for first degree murder.  Law contends that the prosecutor misled the jury as to how many times he struck Nguyen, whether he dragged Nguyen back after Nguyen tried to escape, and

9

whether and why he wiped Nguyen's blood onto a wall. Even assuming that Law's appellate contentions are preserved, we conclude that the prosecutor's characterization of the evidence did not amount to prejudicial misconduct.

### a.    *The Blood on the Gate and Wall*

The prosecutor exhorted the jury to interpret the presence of a blood on both sides of the side gate and on a wall as supporting his ultimately unsuccessful theory of first degree murder. In the prosecutor's telling, the presence of blood on both the front and back of the side gate signified that Nguyen, "as he was beaten and bloodied, . . . tried to escape" through the gate, leaving what the prosecutor opined were bloody finger marks, only to have Law "drag[] him back" into the yard to beat him "in different locations until he was beaten to death [in a] separate place than where he was [first] dragged down to the ground." In a similar vein, the prosecutor argued that bloodstains on a wall at the scene signified that Law had wiped Nguyen's blood there as "the mark of a victor." Law contends that these arguments amounted to misconduct because the testimony of Willis, the crime-scene reconstructionist, belied the prosecution theory. For the reasons that follow, we conclude that the prosecutor's comments regarding the blood on the gate and wall were permissible based on the evidence that was introduced at trial.

As to Nguyen's alleged attempted escape, Law concedes that the prosecution could reasonably have inferred that Nguyen "might have been outside the gate at some point during the fight" due to evidence of blood droplets outside the gate that "could have been deposited directly by Nguyen or have dripped from a bloody object," but argues that "it was pure speculation for the prosecutor to assert that Nguyen had 'tried to escape' before Law 'dragged [him] back' to the spot where his body was found." Willis had opined that either Nguyen or an object bearing a large quantity of his blood had left the blood on each side of the gate. Indeed, given Law's initial denial that Law ever opened the gate, the prosecution's theory that Nguyen had opened the gate in an effort to escape after Law first drew blood cannot be characterized as so implausible as to be misleading.

10

The eventual location of Nguyen's body relative to the gate invited the further inference that Nguyen had not arrived there by choice but by Law's intervention.

Contrary to Law's insistence, the mere absence of "drag marks" in the yard does not refute the inference that Law could nonetheless have forced Nguyen to the spot where he died. Law misreads Willis' testimony by claiming that "the only inference she could draw with any certainty from the location of the blood stains was that a physical altercation had taken place." In the cited excerpt of her testimony, Willis answered "yes" when defense counsel asked, "So *one* thing you can say for certain . . . is a physical altercation occurred in the side yard?" (Italics added.) Because defense counsel stopped short of asking if this were the "only" inference Willis could "say for certain," we decline to read a broader concession into this exchange than its plain terms support.

As for the prosecutor's argument about the blood found on the wall, the meaning of the prosecutor's "mark of a victor" formulation is somewhat opaque. We construe this claim to be, at a minimum, that Law did not incidentally leave the bloodstain by using the wall for support but instead deliberately wiped his bloody hand on the wall. Willis testified that the bloodstains appeared to be a series of handprints and "finger swipes." On cross-examination, she further explained why she considered it more likely that Law had been trying to wipe blood off his hands than merely leaving blood inadvertently as he used the wall for support, although she did not reject the latter possibility. Accordingly, the prosecutor's argument that Law intentionally deposited Nguyen's blood on the wall was grounded firmly in the expert opinion evidence, even if the expert's opinion was subject to debate.

To the extent the prosecutor meant by his argument to convey that Law's intention in leaving the finger swipes was to "mark" his killing of Nguyen as a "victory" over a "vanquished foe," an attorney's entitlement to argue a person's intent based upon the person's acts and circumstances of the crime should not be seriously in question. (See, e.g., *People v. Smith* (2005) 37 Cal.4th 733, 741.) To be sure, this particular inference, if

11

intended, would appear to conflict with the prosecutor's theory that Law concealed evidence by cleaning up the blood and laundering his clothing and towels. But Law offers no authority for the proposition that logical inconsistency or overheated rhetoric of an argument amounts to misconduct.

Persuasive or not, the prosecutor's arguments neither obfuscated nor mischaracterized, even inadvertently, the nature of the underlying evidence. The prosecutor argued his theory of liability from circumstantial evidence susceptible of his preferred inferences and, like all circumstantial evidence, of alternative inferences. That his preferred theory at times required a succession of inferences from the known facts remains within the permissible scope of argument. (See, e.g., *People v. Linton* (2013) 56 Cal.4th 1146, 1208 [permissible for prosecutor to argue defendant masturbated after killing victim, based on location of victim's semen-stained underwear in garbage with items defendant reported discarding after murder].) In short, the prosecutor's argument was trial advocacy.

### b.    *The Number of Blows*

The prosecutor's repeated claim in closing argument that Law had struck Nguyen 42 times presents a closer question, in that it conflicts with the testimony of his own medical examiner. On direct examination of Jorden, the prosecutor had sought her agreement that the "blunt force traumas" she observed on Nguyen's body reflected an equal number of blows. Jorden demurred, and the prosecutor elected to abandon this line of questioning. On cross-examination by defense counsel, Jorden agreed that, by "blunt force trauma," she meant an individual injury, laceration, or abrasion rather than the blow that caused it. Jorden acknowledged that it was possible that a single blow could produce multiple blunt force traumas and that she could not determine from the injuries or their number how many blows Law had inflicted.

Accordingly, in closing argument, when the prosecutor referred specifically to Jorden's testimony, he correctly characterized her testimony as 42 "blunt force traumas."

12

But when arguing how the jury should envision the offense as it transpired, he consistently referred to "42 blows." In arguing that the evidence showed premeditation and deliberation in support of a first degree murder conviction, the prosecutor said: "It wasn't, I hit him three times and I ran into the house and he was alive, no. Victim was dead. He delivered the fatal blow after 42 blows." Later, in arguing that Law did not act in self-defense, the prosecutor said, "Explain to me what world we live in that it's necessary to inflict 42 separate blows, crush a man's skull, break his arm and his two ribs, that that is reasonable, that that is reasonable based on the evidence. [¶] Fail."

The record reflects that the prosecutor was aware of the distinction between the number of blunt force traumas Nguyen experienced and the number of blows that Law visited upon him. On direct examination, the prosecutor's forbearance from pressing Jorden for a more definitive answer suggests he anticipated the unfavorable answer which defense counsel was able to elicit from Jorden on cross-examination. Although Jorden never expressly refuted the possibility that 42 blunt force traumas could have been inflicted by 42 separate blows, her broad definition of "blunt force trauma," her unambiguous concession that multiple such traumas could result from a single blow, and her unmistakable resistance to the prosecutor's attempt to equate the number of injuries and the number of blows combined to make the prosecutor's claim of "42 separate blows" sufficiently implausible that we are unable to deem this a reasonable inference from the evidence. The prosecutor's commentary therefore went beyond a comment on reasonable inferences that could be drawn from the evidence.

On the record as a whole, however, we do not discern " 'a reasonable likelihood the jury understood or applied the complained-of comments in an improper or erroneous manner.' " (*Centeno*, *supra*, 60 Cal.4th at p. 667.) The trial court's instructions blunted the impact of the prosecutorial overreach. Before closing arguments began, the court duly instructed the jury that although the attorneys would discuss the case in their closing arguments, "their remarks are not evidence." More importantly, each time defense

13

counsel objected to prosecutorial argument as misstating the evidence, the trial court reminded the jury that the statements of the lawyers are not evidence.  On the fourth such occasion, the trial court further admonished the jury:  "Please review and listen to the evidence yourself and make your own decisions."  Furthermore, the character of Jorden's testimony and her consistent resistance to quantifying the number of blows based on the number of traumas she had catalogued would have made the unreasonableness of the prosecutor's comment on the evidence have been apparent to the jury, whose attention defense counsel called to the conflict between the prosecutor's characterization and Jorden's actual testimony.[3]  Indeed, the jury's verdict of acquittal on first degree murder, despite the prosecutor's reliance on 42 distinct blows as reflecting premeditation and deliberation, suggests that the jury was as unimpressed by the prosecutor's interpretation of Jorden's actual testimony as by his interpretation of the blood evidence.[4]

### 3.    *Burden Shifting*

Law argues that the prosecutor improperly urged the jury to discredit Law's statements regarding a prior assault he had experienced at his home on the ground that Law had failed to call witnesses to corroborate Law's claim.  Specifically, during

---

[3] In her own closing argument, defense counsel drew the distinction between Jorden's testimony that there were 42 injuries and the prosecutor's conclusion that there were 42 different blows:  "[T]he District Attorney keeps arguing over and over again that it was 42 different blows.  And that is not what Dr. Jorden said.  She described them as 42 injuries."  Defense counsel reminded the jury of Jorden's testimony on direct examination that the 42 injuries included those to Nguyen's hands, which could have been offensive wounds.  Defense counsel erroneously claimed that Jorden had included Nguyen's age-related skin lesions in the count.  As to the balance, defense counsel argued that "a series of lacerations [Jorden] describes in close proximity to the head" were consistent with Jorden's testimony " 'that multiple injuries can result from a single blow from an uneven object like this rock in this case.' "

[4] The express purpose of the prosecution's "mark of a victor" argument was to demonstrate premeditation and deliberation in support of a first degree murder charge. The jury acquitted Law of first degree murder, however, convicting him of second degree murder instead.

14

rebuttal, the prosecutor argued, in effect, that Law's claim that a Vietnamese man had once threatened him at his house with a gun would have been corroborated by testimony from the officer who prepared the resulting police report or a "gang of Vietnamese people" if the incident were in fact significant to Law's state of mind in beating Nguyen: "If this was that big of a deal, if this was true, you would have heard from the police officer who took that report.  You didn't.  [¶] If it was true, you would have heard from this gang of Vietnamese people that could have affected the defendant's state of mind."[5] We conclude that the prosecutor's comments were within permissible bounds.

Because the prosecution bears the burden of proving every element of an offense beyond a reasonable doubt, a prosecutor may not suggest otherwise to the jury.  (*People v. Hill* (1998) 17 Cal.4th 800, 831 (*Hill*).)  Nor may the prosecution misstate the law, such as by representing that the defendant has the burden of producing evidence to demonstrate a reasonable doubt.  (*Id*. at p. 832.)  But subject to these constraints, the prosecution may comment on the state of the evidence or upon the failure of the defense to introduce material evidence or call logical witnesses.  (*People v. Bradford* (1997) 15 Cal.4th 1229, 1339; *People v. Wash* (1993) 6 Cal.4th 215, 262-263 (*Wash*); *People v. Woods* (2006) 146 Cal.App.4th 106, 112-113 (*Woods*).)

According to Law's reading of *Woods*, the prosecutor's reliance on Law's failure to call corroborating witnesses was tantamount to an argument that the prosecution's burden of proof could be satisfied by a defense failure to produce exonerating evidence. *Woods*, however, is distinguishable.  There, defense counsel in closing argument sought to discredit a testifying policy officer based both on the officer's testimony and his actions, which counsel suggested were characteristic of "a 'cowboy cop.' " (*Woods*, *supra*, 146 Cal.App.4th at p. 111.)  In rebuttal, the prosecutor argued that the defense, in

_____

[5] Trial counsel objected twice on the ground that the prosecutor was "shifting the burden."  Although the trial court did not sustain either objection, the trial court directed the prosecutor to "move on" after the second objection.

15

thus challenging the officer's veracity, was "obligated" to call witnesses to testify that the officer did not do his job properly. (*Id.* at p. 112.) The prosecution added that " '[i]f there was anything to show that [the officer] was a bad cop, that he did something that was misconduct or inappropriate or wrong in this day and age, you'd have heard about it. You'd have heard about it right from the witness stand.' " (*Id*. at p. 112.) In reversing, the court reasoned that the statement that defense counsel had an "obligation" to present evidence was particularly "troubling" in that it "expressly and erroneously advised the jury that appellant bore some burden of proof or persuasion." (*Id*. at p. 113.) But the court specifically distinguished the prosecutor's claim of obligation from "mere comment on the defense failure to present evidence of misconduct." (*Ibid.*)

Here, the prosecutor made no such "express and erroneous" suggestion. Fundamentally, the prosecutor argued to the jury that they should not credit Law's self-serving statements regarding the impact of a past assault on his mental state because (1) the past events bore no connection to the events that transpired between Law and Nguyen; and (2) Law did not corroborate his statements by calling witnesses who could confirm the underlying facts. The basic logic of the prosecutor's comments—that if Law's contention were true, Law would have called witnesses who could have corroborated the contention—is consistent with cases concluding there was no prosecutorial misconduct. (See *Bradford*, *supra*, 15 Cal.4th at pp. 1339-1340; *Wash*, *supra*, 6 Cal.4th at p. 263 [although prosecutor should not have invoked the names of experts who did not testify at trial, it was not misconduct to observe "that defendant had failed to adduce expert psychiatric testimony to support the claim that he was depressed and suicidal when he confessed to the crimes"].) There is a material difference between arguing that the jury should choose to reject a contention because it is not corroborated by testimony from logical witnesses other than the defendant and arguing that the jury cannot accept a contention because the defendant had an obligation to put on evidence. (See *Bradford*, *supra*, 15 Cal.4th at p. 1340 ["A distinction clearly exists between the

16

permissible comment that a defendant has not produced any evidence, and on the other hand an improper statement that a defendant has a duty or burden to produce evidence, or a duty or burden to prove her innocence"].)[6]

Alternatively, Law argues that the prosecutor's argument was also improper in that "there was no evidence that a police officer ever took a report on the incident." We reject Law's implication that he never reported the assault to police, thereby making it impossible for him to call as a witness the police officer who prepared the report: Law told the officers investigating Nguyen's death that he called the police after a man came to his house with a gun, and one of these officers testified that he "did pull the report" about the incident but concluded there was "no connection between" the prior incident and Law's altercation with Nguyen. Thus, the record plainly refutes Law's appellate contention: there was a police officer who took Law's report about the incident and could have been called to corroborate the filing or contents of the report.

Law likewise asserts that the prosecutor's reference to a "gang of Vietnamese people" Law could have called unfairly shifts the burden of proof to Law, when there is no evidence that Law knew the person who assaulted him. We agree with Law that there is little support in the record for the proposition that Law could readily have called this so-called "gang of Vietnamese people," apparently to show that they had in some way harassed or threatened him. Yet the prosecutor's fundamental point about the irrelevance of a prior experience of assault—linked to the killing of Nguyen solely by a common ethnicity—was not inappropriate, even if the supposition that Law could identify, locate,

---

[6] To the extent Law suggests that this distinction is "unduly formalistic," his preferred rule would seem to be that the prosecution may never argue for a favorable inference based on the defense's failure to call logical witnesses or present available material evidence. But, as Law himself recognizes in his opening brief, the prosecution is permitted to do so. (See, e.g., *Woods*, *supra*, 146 Cal.App.4th at p. 112; *Bradford*, *supra*, 15 Cal.4th at p. 1340.)

17

and compel the self-incriminatory testimony of his assailants is fanciful.[7]  The jury was well-positioned to evaluate whether the "gang of Vietnamese people" were truly logical witnesses who Law could have identified to corroborate Law's statements to police.  We see no reasonable likelihood that the prosecution led the jury astray with this comment.

### 4. *Misstatement of CALCRIM No. 371*

Law contends that the prosecutor misstated the law concerning the legal significance of a defendant's concealment of evidence.  Although the trial court should have sustained the defense objection to the prosecutor's misstatement of the law, we conclude on this record there is no reasonable likelihood that the jury applied the law as misstated.  Accordingly, we reject this claim of misconduct.

### a. *The Prosecutor's Misstatements*

Before closing arguments, the trial court instructed the jury.  Among these instructions was CALCRIM No. 371:  "If the defendant tried to hide evidence, that conduct may show that he was aware of his guilt.  If you conclude that the defendant made such an attempt, it is up to you to decide its meaning and importance; however, evidence of such an attempt cannot prove guilt by itself."  In his closing argument, the prosecutor transposed this instruction into a more conclusive key, claiming instead:  "The law says if you find the defendant suppressed evidence, what does that mean?  Means he's guilty of the crime."  The trial court overruled defense counsel's objection that this was an improper statement of the law.  The prosecutor then elaborated:  "[Y]ou can't make up self-defense.  You can't make it up.  And that's what he tried to do.  [¶] All

---

[7] Although unrelated to our analysis of the prosecution argument on this point, we note the troubling implications of the defense theory that a prior assault by a Vietnamese stranger supplies a basis for a reasonable fear that an unrelated person of Vietnamese origin posed an imminent threat.  We recognize that defense counsel may have construed Law's admissions as providing little else to work with in her discharge of her ethical duties, but we recognize as well the prosecutor's forbearance from calling out the theory's racist premise.

right. If the defendant tried to hide evidence[,] he was aware of his guilt. It's what [CALCRIM No.] 371 says."

It is improper for the prosecution to misstate the law generally, particularly where the misstatement purports to lessen the prosecution's prima facie obligation to overcome reasonable doubt on all elements. (*Hill*, *supra*, 17 Cal.4th at p. 829.) By stripping CALCRIM No. 371 of any nuance or qualification, the prosecutor incorrectly stated the law as though it established a mandatory presumption.[8]

  **b.**    ***Reasonable Likelihood that the Jury Understood or Applied the Complained-of Comments in an Objectionable Fashion***

Law argues that because the prosecutor offered an incorrect statement of the law and the trial court overruled the defense objection, there is a reasonable likelihood that the jury applied the law as described by the prosecutor notwithstanding the proper jury instruction on the same point. We recognize that a trial court may exacerbate the prosecutor's misstatement of the law by overruling a defense objection. (See *Woods*, *supra*, 146 Cal.App.4th at pp. 113-114 [jury would be misled by misstatement that defense had an " 'obligation' " to present evidence where court implicitly approved the statement by overruling the objection and failing to correct it]; *People v. Doane* (2021) 66 Cal.App.5th 965, 978 [trial court conveyed that prosecutor correctly stated the law by overruling a defense objection].) Taking the record and instructions as a whole, however, we find no reasonable likelihood that the jury understood or applied the law as incorrectly stated by the prosecutor.

There is no dispute that the trial court properly instructed the jury, both orally before closing arguments and through written instructions provided to the jury for

---

[8] Although the prosecutor revised his restatement of CALCRIM No. 371 after the defense objection, his assertion that "[i]f the defendant tried to hide evidence he was aware of his guilt" is also a misstatement of the law, again describing a mandatory presumption.

19

reference during deliberation. Among other things, the trial court directed the jury to follow its statements of the law and to disregard conflicting statements of the law provided by counsel, properly instructed the jury on the prosecution's burden of proof, and properly instructed the jury on the inferences that may be drawn from the suppression of evidence.

The provision of proper oral and written instructions is significant. (See *People v. Cortez* (2016) 63 Cal.4th 101, 131-132 (*Cortez*); see also *People v. Bell* (2019) 7 Cal.5th 70, 111 (*Bell*); *People v. Otero* (2012) 210 Cal.App.4th 865, 873; *People v. Ellison* (2011) 196 Cal.App.4th 1342, 1353 (*Ellison*); cf. *People v. Medellin* (2020) 45 Cal.App.5th 519, 533 [noting likelihood of prejudicial understanding of prosecutor's argument where "the actual instructions did nothing to alleviate the risk the jury would reasonably misunderstand the law"].) As the California Supreme Court has explained, " '[w]e presume that jurors treat the court's instructions as a statement of the law by a judge, and the prosecutor's comments as words spoken by an advocate in an attempt to persuade.' [Citation.] '[P]rosecutorial commentary should not be given undue weight in analyzing how a reasonable jury understood . . . instructions. Juries are warned in advance that counsel's remarks are mere argument, missteps can be challenged when they occur, and juries generally understand that counsel's assertions are the statements of advocates.' " (*Cortez*, *supra*, 63 Cal.4th at p. 131.) Given the trial court's correct instructions in this case both on CALCRIM No. 371 and the jury's obligation to follow the law as provided by the court, together with repeated reminders throughout the prosecutor's closing that his statements were argument only, we are not persuaded that the trial court's decision to overrule the defense objection, without explanation, would likely have been taken an implicit endorsement of the prosecutor's obvious misstatement in this case.

The prosecutor's express reference to the correct instruction, albeit only after the defense objection, likewise tended to mitigate the risk that the jury construed or applied

20

the misstatement in an objectionable fashion. (See *Cortez*, *supra*, 63 Cal.4th at pp. 133-134.) Had the jury been inclined to credit the prosecutor's disputed statement of the law, reference to the instruction itself would have made plain that the prosecutor's error was precisely the type of potentially unreliable attorney argument the trial court had warned the jurors to disregard. (*Bell*, *supra*, 7 Cal.5th at p. 111.) Thus, were it not apparent from the court's instructions themselves that the jury should measure the accuracy of the prosecutor's arguments by their consistency with the court's instructions, the prosecutor made that point contemporaneously with his misstatement of the law.[9]

Even assuming a reasonable likelihood that the jury was misled by the prosecutor's misstatement of CALCRIM No. 371, reversal would not be warranted on this record, because "[i]t is not reasonably probable that a result more favorable to [Law] would have been reached absent the misconduct or with a curative admonition." (*Arias*, *supra*, 13 Cal.4th at p. 161.) Even without the prosecutor's misstatement of CALCRIM No. 371, Law's claim of self-defense was undermined by his extensive statements to police, particularly his admissions that he may have gone "too far" and that Nguyen was no longer a threat to him when Law was on top of him on the ground. Law's injuries were also minor, both considered alone and particularly in contrast with the grisly state of Nguyen's arm, face, head, and brain.

**B.      *Disclosure of Impeachment Evidence***

Law argues that the prosecution violated his right to due process of law under *Brady v. Maryland* (1963) 373 U.S. 83 (*Brady*) by failing to timely disclose the Jorden

---

[9] Law's acquittal on first degree murder is significant, because it was principally in support of an inference of premeditation and deliberation that the prosecutor argued Law's concealment of evidence was probative. To the extent the jury found that Law suppressed evidence, the partial acquittal undermines an inference that the jury applied the law as stated by the prosecutor to presume guilt. (*Ellison*, *supra*, 196 Cal.App.4th at p. 1353 [acquittal on most serious charges demonstrated that jury understood the burden of proof as instructed].)

Memo. We conclude that the prosecution's untimely disclosure did not violate Law's constitutional rights because the memo was not material on the specific circumstances of this case.

## 1. *Legal Principles*

Pursuant to *Brady* and its progeny, the accused's constitutional right to due process of law requires the prosecution to disclose evidence that is " 'favorable to [the] accused' and 'material to either guilt or punishment.' " (*Association for Los Angeles Deputy Sheriffs v. Superior Court* (2019) 8 Cal.5th 28, 40 (*Los Angeles Deputy Sheriffs*) [quoting *Brady*, *supra*, 373 U.S. at p. 87]; *People v. Superior Court (Johnson)* (2015) 61 Cal.4th 696, 709.) "Such disclosure may be required even if the prosecutor is not personally aware that the evidence exists." (*Los Angeles Deputy Sheriffs, supra*, 8 Cal.5th at p. 36.) "[F]avorable" evidence includes evidence that would impeach a prosecution witness. (*Id.* at p. 40.) "Evidence is material ' "if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." ' [Citation.] Evaluating materiality requires consideration of the collective significance of the undisclosed evidence [citation], as well as 'the effect of the nondisclosure on defense investigations and trial strategies [citation]. [Citation.] 'A reasonable probability does not mean that the defendant "would more likely than not have received a different verdict with the evidence," only that the likelihood of a different result is great enough to "undermine[] confidence in the outcome of the trial." ' [Citation.] " (*Los Angeles Deputy Sheriffs*, 8 Cal.5th at p. 40.)

"We independently review the question whether a *Brady* violation has occurred, but give great weight to any trial court findings of fact that are supported by substantial evidence." (*People v. Letner and Tobin* (2010) 50 Cal.4th 99, 176 (*Letner and Tobin*); see also *People v. Wilson* (2020) 56 Cal.App.5th 128, 160.)

**2.**     *Materiality*

In the trial court, Law argued that timely disclosure of the Jorden Memo would have enabled him to impeach Jorden by showing that she was biased in favor of conviction.  On appeal, Law adds that he would have used the Jorden Memo to impeach the entire prosecution team on the ground that Jorden's viewpoints were symptomatic of "systemic bias against criminal defendants in general[.]"  Although we agree that the Jorden Memo was favorable to the defense and could have been used to impeach Jorden, we conclude that—on this record—there is no reasonable probability that Law would have received a different verdict with the benefit of the undisclosed evidence or an investigation flowing therefrom.  It was therefore not material.

As a threshold matter, the issue on which Jorden testified—the cause and manner of death—was uncontested.  In her opening statement, defense counsel told the jury that "cause of death isn't disputed."  Likewise, in closing argument, defense counsel reiterated:  "I told you at the very beginning, he killed him by hitting him in the head."  The record of Law's confession over the course of three interviews with law enforcement left him no viable alternative to conceding the cause of death.  Irrespective of bias, then, Law could not credibly contest Jorden's opinion that that Nguyen died as a result of "cranial cerebral injuries due to multiple blunt head trauma."  (See *Letner and Tobin*, *supra*, 50 Cal.4th at p. 177 [in general, impeachment evidence has been found to be material where the witness at issue supplied the only evidence linking the defendant to the crime or where the likely impact on the witness's credibility would have undermined a critical element of the prosecution's case].)

Law argues that even though Jorden's ultimate opinion was uncontested, Jorden gave damaging testimony regarding the number of injuries Nguyen suffered.  Specifically, Law argues that he would have challenged Jorden's testimony that Nguyen suffered 42 separate injuries and 17 blunt force traumas to the head.  But Jorden's account of Nguyen's injuries was corroborated at trial by X-ray images of his broken

23

skull and orbital bone, by graphic photos of Nguyen's body, and by the arguable presence of Nguyen's brain matter on the bloody brick, the fence, and the "chunk" of bloody matter on Law's face when Ho first saw him. The acuity and extremity of the injuries Nguyen suffered was therefore not reasonably in dispute.

Even if impeaching Jorden would have permitted the defense to call into question the reliability of Jorden's count of blunt force traumas, the vividly documented state of Nguyen's head and evidence suggesting the presence of his brain matter on the fence, rock, and brick—particularly in combination with Law's equivocation about how Nguyen had struck him and whether Law continued to be fearful once he was on top of Nguyen— leaves us no reasonable likelihood that the mere numerical tally of Nguyen's injuries would have lent weight to Law's claim of self-defense. The theory of self-defense was further undermined by Ho's testimony that it was because Nguyen had seemed unwell that she was anxious to locate him, and by Law's size advantage over Nguyen.

Moreover, Law's defense relied heavily on crediting rather than impeaching Jorden's testimony to counter the prosecution's theory of premeditation and deliberation necessary for first degree murder. In closing argument, defense counsel invoked Jorden by name no fewer than four times to challenge the prosecution's arguments. In particular, Jorden's testimony was critical to rebut the prosecutor's contention that the sheer number of injuries reflected so many blows that the jury should find that Law acted with premeditation and deliberation. Accordingly, defense counsel argued, "Dr. Jorden is a very well-educated doctor. She's done, I think, 3,500 autopsies. . . . [¶] I'm going to take you back to the circumstantial evidence instruction. This is a great example." To mitigate Willis's testimony that some of the blood stains came from expirated blood, defense counsel argued that Jorden's testimony made this unremarkable for a blow to the face. Although Jorden was a prosecution witness, a successful defense effort to discredit her would likely have been a pyrrhic victory at best: the uncontroverted physical evidence, Law's admission that he "maybe went too far," and the narrow disputed issues

24

of mental state and justification left little to be gained by discrediting her, and potentially much to be lost as to the prosecution's theory of first degree murder.

As for Law's latest theory that the Jorden Memo would have allowed him to impeach other prosecution witnesses, there is no reasonable probability that Law would have received a different verdict under such a theory of relevance. Law proffers no theory by which the Jorden Memo—if admissible—could have furthered his effort to demonstrate bias by anyone other than Jorden. Jorden's bias has no tendency to prove or disprove, or suggest the existence of evidence proving or disproving, that any other prosecution witness or member of the prosecution was biased against Law, or criminal defendants generally. (See generally *People v. Freeman* (1994) 8 Cal.4th 450, 491 [relevant evidence is evidence having any tendency in reason to prove or disprove any disputed fact that is of consequence to the determination of the action].) To the contrary, the fact and tenor of the memo suggest that the author himself—indisputably a member of the District Attorney's Office—harbored significant concerns about Dr. Jorden's bias and professionalism, saw fit to document those concerns as reflected in multiple cases, and bring those concerns to the District Attorney himself.[10] Although these concerns beg the question why the Jorden Memo had not been more widely disseminated within the office in the seven years separating its transmission to the District Attorney and Law's trial, they do nothing to impeach the credibility of the specific law enforcement witnesses who testified at Law's trial.

## C. *Cumulative Prejudice*

Law contends that even if none of his several contentions on appeal warrant reversal standing alone, they "rise by accretion to the level of reversible prejudicial error." (See *Hill*, *supra*, 17 Cal.4th at p. 844.) We disagree.

---

[10] The prosecution argued in the trial court that it had no obligation to disclose the memo at all. We caution that our case-specific holding here is not an endorsement of that assertion.

Law has identified two instances of prosecutorial overreach during his closing arguments: the prosecutor implicitly argued an implausible inference from Jorden's testimony—that 42 blunt force traumas equated to 42 blows—and then misstated the legal effect of a potential finding that Law attempted to clean up the scene. These two discrete but improper comments reflect isolated portions of the prosecutor's lengthy argument rather than a systematic effort to mislead the jury or a pattern of misconduct that has a tendency to build on itself. (See *People v. Shazier* (2014) 60 Cal.4th 109, 150-151 (*Shazier*); see also *Hill*, *supra*, 17 Cal.4th at pp. 844-847 ["sheer number of instances of prosecutorial misconduct," including "pervasive campaign to mislead the jury on key legal points" and "unceasing denigration of defense counsel before the jury," "created a negative synergistic effect"].) Had there been any cumulative impact of the prosecutor's implausible inference from Jorden's testimony and his misstatement of the law, we conclude the impact would have tended to undermine the prosecutor's credibility rather than Law's defense.

We are likewise unable to fathom a means by which the untimely disclosure of the Jorden memo could plausibly amplify any prejudice from the prosecutor's remarks. The defense election at trial to credit Jorden's testimony, specifically as a means of negating the prosecution theory of 42 separate blows, forecloses a determination that the two asserted errors cumulate rather than counteract.

Considering all Law's claims of error, we conclude that there is no reasonable probability that the result of the proceedings would have been more favorable to Law in the absence of the improper comments together with earlier disclosure of the Jorden Memo. (See *Shazier*, *supra*, 60 Cal.4th at pp. 150-151.)

### III.   DISPOSITION

We affirm the judgment.

26

_____

LIE, J.

WE CONCUR:

_____

GREENWOOD, P.J.

_____

GROVER, J.

*People v. Law*
H047356